## HENRY T. ARMSTRONG V. STATE.

### No. A-159. Opinion Filed August 23, 1909.

### (103 Pac. 658.)

1. **JURY—Separation of Jury—Constitutional Law.** The provision of criminal procedure (section 5512, Wilson's Rev. & Ann. St. 1903) authorizing the court, in its discretion, to permit the separation of the jury at any time before the final submission of the cause, is not repugnant to the Constitution, and does not violate section 19 of the Bill of Rights, providing that "the right of trial by jury shall be and remain inviolate."

2. **SAME—Discretion of Court.** Section 5512, Wilson's Rev. & Ann. St. 1903, providing that: "The jurors sworn to try an indictment, may, at any time before the submission of the cause to the jury, in the discretion of the court, be permitted to separate, or to be kept in charge of proper officers"—leaves the question of keeping the jury together during the trial of a capital case in the discretion of the trial court.

3. **NEW TRIAL—Separation of Jury.** A motion for a new trial on the ground of separation of the jury before the final submission of the cause is properly denied, where no request was made that the jury be kept in charge of proper officers, and where no objection was made to permitting the jury to separate, and where no proof of prejudice to the prisoner by reason thereof is offered in support of said motion.

4. **APPEAL—Review—Discretion of Lower Court.** The Criminal Court of Appeals will not review the action of the trial court, where the statute in plain and unambiguous terms confers a discretionary power upon the trial court, unless it affirmatively appears from the record that there was such an abuse of discretion as denied the defendant a fair and impartial trial.

5. **PUNISHMENT—Death Sentence—Time of Execution.** The provisions of the Code of Criminal Procedure (sections 5599 and 5600,

Wilson's Rev. & Ann. St. 1903), providing that if, for any reason, a judgment of death has not been executed, and it remains in force, the court in which the conviction was had, on the application of the district attorney, must order the defendant to be brought before it, and must inquire into the facts, and, if no legal reason exists against the execution of the judgment, must make an order that the sheriff execute the judgment at a specified time, applies where there has been an order made suspending the sentence for an indefinite time, by reason of an appeal from the judgment to the Criminal Court of Appeals.

6.    HOMICIDE—Sufficiency of Evidence for Death Penalty. See evidence held sufficient to support a verdict for murder with the death penalty.

(Syllabus by the Court.)

*Error from District Court, Noble County; W. M. Bowles, Judge.*

Henry T. Armstrong was convicted of murder, and he brings error. Affirmed.

Henry T. Armstrong, plaintiff in error, hereinafter designated "defendant," was convicted of murder, and his punishment assessed at death. This conviction was had on an information filed by Charles R. Bostick, county attorney of Noble county, in the district court of said county, on the 15th day of February, 1909. Said information charged that defendant, Henry T. Armstrong, and Albert Mitchell, on or about the 19th day of December, 1908, did, with malice aforethought, kill and murder one Isaac W. Fell by shooting him with a pistol. On the 16th day of February, 1909, Albert Mitchell, codefendant, demanded a severance and was granted a separate trial. On the 18th day of February, 1909, the defendant was duly arraigned, and entered a plea of "Not guilty." On March 24, 1909, both parties announced ready for trial, and thereupon the jury was selected and sworn to try the cause. On March 25th, at the close of the evidence, the court directed that the jury be kept in charge of a sworn baliff. The court charged the jury, and, after hearing the argument of counsel the case was submitted to the jury. On March 26th, 1 o'clock a. m., the jury returned into court their verdict, which, omitting the caption, reads as follows:

"We, the jury impaneled and sworn to try the issues in the above entitled cause, do, upon our oaths, find the defendant, Henry T. Armstrong, guilty of murder as charged in the information and fix his punishment at death. W. H. Wintermute, Foreman."

Whereupon the court appointed March 29, 1909, as the time for pronouncing judgment. March 29, 1909, defendant filed his motion for new trial and motion in arrest of judgment, which motions were by the court overruled and exceptions allowed. Whereupon the court informed the defendant of the nature of the information, the plea thereto, and the verdict, asking defendant if he had any legal cause to show why judgment should not be pronounced against him. Defendant answered, "I have none." Whereupon the court pronounced judgment and sentence in accordance with the verdict and fixed the time of his execution on the 21st day of May, 1909, to which judgment and sentence the defendant excepted and prayed an appeal to the Criminal Court of Appeals of the state of Oklahoma. Whereupon the court ordered that the time to make and serve a case-made be extended for a period of 20 days, 10 days thereafter to suggest amendments; said cause to be settled and signed within 5 day's notice by either party and to be filed in the Criminal Court of Appeals of the state of Oklahoma within 40 days. May 6, 1909, the petition in error and case-made were filed in this court, at which time Judge Baker made an order suspending the execution of the judgment of death until the further order of this court. On motion of Assistant Attorney General Moore, said cause was advanced and submitted at the July, 1909, term, and is now before this court for review.

F. S. Winn, for plaintiff in error.

Charles West, Atty. Gen., Chas. L. Moore, Asst. Atty. Gen., Charles R. Bostick, and Henry S. Johnston, for the State.—On separation of jury: Brink v. Territory, 3 Okla. 588; Shivers v. Territory, 13 Okla. 466; People v. Chaves (Cal.) 54 Pac. 596; State v. Hendricks (Kan.) 4 Pac. 1050; State v. Shaffer (Or.) 32 Pac. 545; State v. Nelson (Minn.) 97 N. W. 652; Hamilton v.

*State* (Ark.) 36 S. W. 1054; *People v. Bemmerly* (Cal.) 33 Pac. 263; *Gott v. People* (Ill.) 58 N. E. 293; *Com. v. Williams* (Penn.) 58. Atl. 922.

DOYLE, JUDGE. (after stating the facts as above). As viewed in the light of the evidence before us, this was a crime of appalling atrocity. The main features of· the evidence may be succinctly stated as follows: The deceased, with his wife and three children of tender years, resided on a rented farm, known as the "Mossman Place," about 10 miles northeast of Perry and two miles west of Otoe Station in Noble county. In the spring of 1908, the deceased and defendant put in a cotton crop on this farm upon the shares, and the defendant stayed at the home of the deceased until some time in July of that year. They also had a joint interest in some live stock, which was heavily mortgaged. The crop was destroyed by cattle, and the defendant departed without a settlement or division of the partnership property. Codefendant, Albert Mitchell, worked for the deceased 28 days during the months of June and July, and left without receiving his wages. The evidence shows that the deceased in the month of December, 1908, was working near the Arkansas river, about 20 miles northeast of his home, and with him were three Ward brothers, who when at home lived with their father, Andy Ward, a near neighbor of the deceased. A few days prior to the murder, the defendant visited the home of the deceased, and asked his wife where her husband was, and where his team was, and then inquired if he had taken his shotgun with him.

The evidence further shows: That on the night of December 16th the defendant and Mitchell, codefendant, stayed at Andy Ward's place, about one mile south of the home of the deceased. That on the evening of Thursday, December 17th, they drove to where Fell was working, and camped that night with Ephriam and George Ward, in a tent near by a tent occupied by Fell and Fred Ward, and while there defendant stated to the Wards that he was going to have that team of Mr. Fell's or kill him. Early

the next morning, with Fell's team and Ward's wagon, Fell and Fred Ward drove to Red Rock with a load of corn. Fell then went to his home. The defendant and Mitchell drove back to Andy Ward's that evening, and there again met Fell. The next morning defendant and Mitchell drove from Andy Ward's to the place of a man named "Breckenridge," about one-half a mile east of Fell's home. They were driving a team of ponies to a top buggy, and stated that they were waiting to go with Mr. Fell to where he was working on the Arkansas river. About 11 o'clock Fell drove by in a farm wagon, and the defendant and Mitchell, leaving Breckenridge's, drove after him, overtaking him near Otoe Station. Soon after the defendant, driving his top buggy, returned to Fell's home with an order written and signed by Fell for a set of harness, and presented it to Mrs. Fell, and took the harness. Fell had with him that morning in the bottom of his wagon a shotgun in a gun case. The evidence shows that Fell was held a prisoner at a point about one mile southeast of Otoe Station until about 4 o'clock that day, at which time he was murdered by being shot in the temple and through the top of the head.

The defendant, testifying on his own behalf, stated: That he was 59 years old, admitted that he had called at the home of Mr. Fell a few days before the murder was committed and inquired of his wife if he had his shotgun with him, and that he and Mitchell went to the corn camp near the Arkansas river on the 17th day of December, stating they went there for the purpose of collecting the wages due Mitchell, and that they stayed at Andy Ward's on the night of the 18th of December, and had stopped at Breckenridge's on the morning of December 19th, from 8 o'clock until 11 o'clock, waiting for Mr. Fell to come along. When Mr. Fell drove by, that he and his codefendant, Mitchell, followed, overtaking him near the Otoe switch. That Mitchell got in the wagon with Fell and took his shotgun out of a gun case and compelled Fell and the defendant to drive to a hollow in the prairie and there compelled Mr. Fell to write an

order as follows: "Let H. T. Armstrong have this harness. W. I. Fell"— and ordered defendant to return to Mr. Fell's home with the order and get the harness. That defendant went and did as he was ordered; driving his team and buggy back, he presented the order to Mrs. Fell, and received the harness, and returned with it. That Fell at this time was lying under a blanket in the bottom of his wagon. That they unhitched the team in a hollow about a mile southeast of the Otoe switch and fed the horses. That about 4 o'clock in the afternoon, Mitchell, when defendant was not looking, shot Mr. Fell. That defendant looked around, and Mitchell placed the gun on the top of Fell's head and shot him again. That the shooting was done with defendant's 44-caliber pistol. That Mitchell then compelled defendant to help him put the body in the wagon. That they hitched up the horses; defendant going ahead with his team and buggy, and Mitchell behind him driving the team and wagon of the deceased, and drove to where the well was. That when they arrived there it was after dark. That Mitchell uncovered the well and ordered defendant to get out of his buggy and help him move the body. That Mitchell then took the body and dropped it into the well and covered the place up with boards and then burned the blood stained hay that had covered the body. That they then went to the home of Mitchell's father. That he stayed there until Wednesday. That he then drove to Shawnee and then went west five or six miles to Jo Whipple's place, where later he was apprehended. Defendant denied that he had made threats against the life of the deceased. He admitted that he had made a confession of guilt, but claimed that his admission of guilt was made under duress.

As serious as is the nature of the case here presented, there really appears nothing, after a most careful consideration of the record, which should require a discussion of the case. No objection was raised to the information. It is sufficient, and no objection is urged to the charge of the court, which was an able and eminently fair exposition of the law. The sole contention of coun-

sel for defendant is that: "The court erred in permitting the jury to separate during the trial of the cause."

The record shows that, while the jurors were permitted to separate after being impaneled, the court properly and correctly admonished them as required by the statute; but counsel argues in his brief that:

"To say the least, it was certainly a gross abuse of judicial discretion for the court to permit the jurors to separate from each other, and to be away from the custody of an officer of the court and to mingle promiscuously with the people about the city during the progress of said trial, and to say that the defendant, now plaintiff in error, could have a fair and impartial trial of a cause such as this under the circumstances, as herein detailed, would be mockery of justice, and would violate the very first principle of our government."

We cannot agree with counsel for defendant. There was no request made that the jury be kept in charge of an officer, and there was no objection made to permitting them to separate. The question was first raised in the motion for a new trial, but no proof was offered that defendant's rights were prejudiced thereby. The record shows that, at the close of the evidence in the forenoon of the second day of the trial, the court directed that a bailiff be sworn to take charge of the jury, and that they be kept in charge of said bailiff, that this was done, and that the jury remained in the custody of the said bailiff until they returned into court with their verdict.

The distinction between the case at bar and the case of *Bilton v. Territory of Oklahoma,* 1 Okla. Cr. 566, 99 Pac. 163, is clear and definite. In the Bilton Case the jury was permitted to separate after the case had been finally submitted and the jury had retired for the purpose of deliberation, and in that case the jury, when sworn to try the cause, was placed in charge of a sworn bailiff, and the jury was permitted without leave of the court to separate at different times during the introduction of testimony, and it was undisputed that some three or four of the jurors drank whisky out of a bottle at the hotel, and that two of

the jurors visited a saloon and drank whisky during the time they were hearing the cause and deliberating upon their verdict. Upon these facts, Judge Baker, speaking for this court, said:

"In any criminal case it is error to permit the jury to separate after the case has been submitted to them, and before they have reached a verdict. The object intended to be gained by preventing the separation of the jury is to safeguard in every possible way the purity of the stream of justice; to prevent it from in any manner being polluted by influences other than that which are produced by the legal evidence and the law governing the case. Such a course is both a protection to the interests of the state in bringing to justice one who may have committed a crime, and safeguards the rights of the accused on trial for his life. It will be conceded by all interested in the administration of justice: That one accused of crime is to be convicted or acquitted only upon the evidence given in his presence; that the minds of those who are to decide questions involving life and liberty are free from prejudgment; that in the course of the trial no impression ought to operate on their minds, except that which is derived from the testimony presented to them in open court and the law as given them in the charge by the court; that the minds of the jurors shall be free from prejudice and bias, either for or against the prosecution or the accused before the trial begins, and shall continue impartial until they have delivered themselves of their verdict. This can be guaranteed only by preventing the separation of the jury, and the prudence and care of the trial court and the officers thereof. Such a course of procedure will free the minds of the public, as well as the parties directly interested in the trial of the case, from the slightest suspicion that the stream of justice is not in all respects pure and free from contamination. Absolute impartiality and fairness in the trial of criminal cases should be desired by all concerned. Preventing the separation of the jury offers the best means to prevent undue and unlawful influences. To keep the jury from separating may at times be difficult of accomplishment; but the trial court should make proper provision therefor, and the rule against the separation of jurors in capital cases should in no manner be relaxed, except in cases of unavoidable necessity."

Sec. 5519, Wilson's Rev. & Ann. St. 1903, provides:

"After hearing the charge, the jury may either decide in court, or may retire for deliberation. If they do not agree without retiring, one or more officers must be sworn to keep them together in some private and convenient place, without food or drink, except bread and water, unless otherwise ordered by the court, and not to permit any person to speak to or communicate with them, nor do so themselves, unless it be by order of the court, or to ask them whether they have agreed upon a verdict, and to return them into court when they have so agreed or when ordered by the court."

It is our opinion that this section imperatively requires that, upon the final submission of the cause to the jury, they cannot be permitted to separate, and if, after such submission, the jury separates, such separation vitiates the verdict, notwithstanding no affirmative proof of prejudice is offered. When this provision of the law is violated, the legal presumption is that it has actually prejudiced the defendant, or tended to his prejudice, in respect to a substantial right, and this court so held in the Bilton Case.

It is not claimed in the case at bar that there was a separation of the jurors after the final submission of the cause or after the jury retired to consider their verdict. The question in this case requires only a construction of section 5512, Wilson's Rev. & Ann. St. 1903, which provides:

"The jurors sworn to try an indictment, may, at any time before the submission of the cause to the jury, in the discretion of the court, be permitted to separate, or to be kept in charge of proper officers. The officers must be sworn to keep the jurors together until the next meeting of the court, to suffer no person to speak to or communicate with them, nor to do so themselves, on any subject connected with the trial, and to return them into the court at the next meeting thereof."

Under this provision the segregation of the jury in felony cases, before the cause is finally submitted, is left in the discretion of the trial court, yet we believe that in the exercise of sound judicial discretion the trial court in a capital case should not refuse a request from either party to place the jury in charge of sworn officers during the progress of the trial. The legal

presumption is that jurors perform their duty in accordance with the oath they have taken, and that presumption is not overcome by proof of the mere fact that, during the adjournments of a trial, the jurors were permitted to separate. The defendant must affirmatively show that by reason thereof he was denied a fair and impartial trial, or that his substantial rights were prejudiced thereby.

Construing a statute identical in its language, the Supreme Court of California, in the case of *People v. Chaves,* 122 Cal. 134, 54 Pac. 596, say:

"While the jury was being empaneled, and during the progress of the trial, the court took a recess several times, and at each of such times, after properly admonishing the jurors, permitted them to separate, without the consent of defendant or his counsel. No objection to the separation was made; but it is now claimed for appellant that it was error for the court to permit the jurors to separate, and that section 1121 of the Penal Code, which authorized the court in its discretion to permit the separations, is unconstitutional because it is inconsistent with that provision of the Constitution which declares that: 'The right of a trial by jury shall be secured to all, and remain inviolate.' Article 1, par. 7. The section of the Code referred to is not unconstitutional. It in no way violates or interferes with the right that every one has to a fair trial by jury. The matter rested in the discretion of the court, and, as no abuse of that discretion appears, its action was justified and proper."

The Supreme Court of Arkansas, in a capital case (*Hamilton v. State,* 62 Ark. 543, 36 S. W. 1054), said:

"It is said that the court, against the objection of the defendant, permitted the jurors to separate before the case was finally submitted to them. This also was a matter within the discretion of the court. San. & H. Dig. par. 2236. But in *Johnson v. State,* 32 Ark. 309, it was remarked by this court that 'such discretion should be exercised, especially in trials for felony, with the utmost caution.' The great interest usually taken by the public in trials for offenses punishable by death, and the danger that either the state or defendant may suffer prejudice from such separation of the jurors, make it, in our opinion, rarely prudent for a court to permit such separation in trials for capital offenses, when either the counsel for the state or defend-

ant objects. It is not always easy in such a case to ascertain the influences to which a separation has subjected the jurors. For this reason, as the defendant objected to the separation of the jurors, we believe that it would have been better to have kept them together; but as the statute leaves this matter to the discretion of the circuit court, and as there is nothing to show that the defendant was prejudiced by the separation, the exception must be overruled, and a new trial on that ground refused."

The Supreme Court of Oregon, in the case of *State v. Shaffer*, 23 Or. 557, 32 Pac. 546, said:

"The next objection is that the court allowed the jury to separate during the trial of the defendant. This is a matter within the discretion of the court, who may permit the jury to separate pending the trial upon properly admonishing them touching their duties. It is expressly provided by our Code that the jury may be kept together, in charge of a proper officer, or may, in the discretion of the court, at any time before the submission of the cause to them, be permitted to separate; but in either case they may be admonished by the court that it is their duty not to converse with any other person, or among themselves, on any subject connected with the trial, or to express any opinion therein until the case is finally submitted to them. Section 198, Hill's Code; *Stephens v. People,* 19 N. Y. 549."

The Supreme Court of Kansas, in the case of *State v. Hendricks,* 32 Kan. 559, 4 Pac. 1050, said:

"No error was committed by the court in permitting the jury to separate. The court, in a criminal prosecution for murder in the first degree, as well as in other cases, may permit a separation of the jury after instructions are given, and before the arguments of counsel are fully completed, and, indeed, at any time before the jury are allowed to retire under the charge of their bailiff for final deliberation upon their verdict."

The Supreme Court of Minnesota, in the case of *State v. Nelson,* 91 Minn. 143, 97 N. W. 652, said:

"At the opening of the trial, defendants requested, in view of the alleged public feeling at Owatonna, the place of holding the trial, that the jury be kept in charge of the sheriff and not permitted to separate. The court denied the request, and this order, also, is assigned as error. The question has frequently

2 Cr.—37

been before us, and we have uniformly held that it is a matter purely discretionary with the trial court whether to confine the jury or permit them to separate during the trial. No reason is presented in the record in this case to justify us in holding that the court abused its discretion. *State v. Bilansky,* 3 Minn. 246 (Gil. 169) ; *State v. Ryan,* 13 Minn. 370 (Gil. 343)."

The rule to be deduced from these cases is that, where a statute in plain and unambiguous terms confers a discretionary power upon the court, as to whether or not the jury shall be permitted to separate, during the trial of a capital case, the fact that the court permitted the jury to separate, without objection on the part of the defendant, is not ground for a new trial. An appellate court is authorized to say that the trial court erred in a matter of this kind, only when it affirmatively appears from the record that there was such an abuse of discretion as denied the defendant a fair and impartial trial; but where the defendant by affirmative proof shows that, by reason of such separation of the jury, his substantial rights were prejudiced, a new trial should be granted.

This provision of our statute is an ample safeguard over the purity of jury trials. The clear intention of the lawmaking power is that the mere separation of the jury during the numerous and necessary adjournments incidental to a criminal trial should not result in delaying or defeating the ends of justice, when there is not the slightest presumption or probability or even possibility of injustice to the defendant. In this case, when viewed in the light of the record, the criticism of the counsel for defendant has no merit. It clearly appears that the defendant suffered no injury by reason of the separation of the jury. While we must at all times guard the rights of the accused, we must not be so technical in procedure as to set aside fair and impartial trials upon mere shadows, thus bringing the administration of criminal justice into endless delay and public derision.

We have carefully examined the record, independent of the assignment of errors, and have given the case that careful consideration which its importance and its solemn consequences to

the defendant demand. We find no error in the proceedings and conviction. The evidence, consisting in part of the voluntary confessions of the defendant, conclusively and beyond any reasonable doubt establishes his guilt of the crime. Upon the testimony of defendant himself, he is guilty. To all appearances a more wanton, cruel, and cold-blooded assassination was never perpetrated, and the jury were clearly warranted in the verdict which they have rendered under the law and the facts of the case. It is the opinion of the court that the defendant has had a fair and impartial trial in accordance with the most rigid rules of the law. By his own deliberate and demoniacal act he has forfeited his life, and the stern but just penalty of the law must be enforced upon him.

Solemn as is the judgment, for the reasons stated, we are compelled to affirm it. As the day fixed for the execution of the judgment and sentence has passed, and as the order staying the execution of judgment fails to fix a definite date, the cause is remanded to the district court of Noble county, with directions to cause the defendant to be brought before it, and to then and there fix another day for the execution of judgment and sentence.

FURMAN, PRESIDING JUDGE, and OWEN, JUDGE, concur.